## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## ABERDEEN DIVISION

**ROBERT N. CHAMBERS, JR.**                                **PLAINTIFF**

**V.**                **Civil Action No.: 1:23-cv-000118-SA-DAS**

**AMERICAN FAMILY ASSOCIATION, ET AL.**          **DEFENDANTS**

## DEFENDANTS' REBUTTAL IN SUPPORT OF
## THEIR MOTION TO ENFORCE SETTLEMENT

Plaintiff's Response essentially ignores the question of whether the material terms of settlement were reached and confirmed by the parties' emails in May of 2024. He focuses instead on the exchange of the form release, an action to which the parties had agreed when they reached and confirmed settlement in their May 20 and May 23 emails. Having agreed upon the material settlement terms, Plaintiff cannot now simply refuse to enter into the written agreement embodying those terms in an effort to argue a settlement was never reached. As Plaintiff's counsel previously conceded, the parties reached an agreement as to all material terms and Plaintiff's last exchange of the definitive release agreement recognized that reality. The Court should hold the parties to their agreement and compel Plaintiff to execute and deliver the agreement embodying those agreed upon material terms.

### 1. *Plaintiff ignores the favorability of settlements under both federal and state law.*

Plaintiff largely avoids discussion of cases noting Mississippi and federal preference for enforcement of settlements.[1] That law is worth repeating, however, in view of Plaintiff's focus on

---

[1] Plaintiff also struggles to rebut Defendants' argument that federal law applies at least to the settlement of his federal claims, asserting that the Court should apply state law because the form of the release (which he contends was never agreed to) included a Mississippi choice of law provision. At least one Fifth Circuit district court under similar circumstances has applied federal law to all of the plaintiff's claims, but the result here should be the same regardless of whether the Court applies Mississippi or federal law. *See*, e.g., *Coleman v. City of Opelousa*, 2021 U.S. Dist. LEXIS 162226, *6 (W.D. La. Jul. 23, 2021) ("A court exercising diversity jurisdiction applies the law of the state in which the settlement agreement was negotiated, while a court exercising federal-question jurisdiction applies federal law to the enforcement of settlement agreements.").

more general contract principles. Here, settlement was reached and confirmed by exchange of emails, which both Mississippi and federal courts consistently enforce. *Pharmley v. 84 Lumber Co.*, 911 So.2d 569, 572 (Miss. Ct. App. 2005); *see also Harmon v. Journal Pub. Co.*, 476 F. App'x 756, 757 (5th Cir. 2012) (under Fifth Circuit law, "settlements are not required to be reduced to writing and oral settlement agreements are enforceable."). In *Pharmley*, the court found that defense counsel had accepted the plaintiff's settlement offer based upon email and facsimile exchanges, even though a formal settlement agreement was never executed. 911 So. 2d at 572-73. In holding the settlement was binding, the court in *Pharmley* explained that Mississippi law recognizes both oral and written settlement agreements, and settlement agreements may be established through the actions of the parties' respective counsel, who are presumed to have the apparent authority to speak for and bind their respective clients. *Id.* Though Plaintiff in this case does not refute these principles, he does not discuss their applicability.

A settlement may exist without a formal release being signed, and Plaintiff's unwillingness to sign a definitive agreement is irrelevant to whether the material terms of settlement were reached. *Parmely*, 911 So. 2d at 572; *see also E.E.O.C. v. Philip Servs. Corp.*, 635 F.3d 164, 167 (5th Cir. 2011) ("Federal law does not require settlement agreements to be reduced to writing."). The May email exchanges in this case indeed anticipated and required that a settlement agreement and release would be reduced to a formal writing, but this provision did not nullify the otherwise binding agreement already formed through the parties' email exchanges as to the material terms of that agreement.

Likewise, while Plaintiff attempts to push the burden of persuasion to Defendants, under federal law "one who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity." *Carter v. H2R Rest. Holdings*, 2018 U.S. Dist. LEXIS 63686, *12

(N.D. Tex. Mar. 15, 2018) (quoting *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 389 (5th Cir. 1984)). And while the "party opposing enforcement of the settlement based on a challenge to the validity of the agreement must be allowed an evidentiary hearing on disputed issues of the validity and scope of the agreement," "where no dispute of fact as to the validity or scope of a settlement agreement is shown, the Court may properly summariliy enforce the parties' preexisting agreement." *Id.* (citing *Ochoa-Bunsow v. C.I.R.*, 623 F. App'x 226, 227 (5th Cir. 1992)).

Here, there is no such dispute of fact as the parties' written communications embody their assent to the material terms of agreement. And while Plaintiff alludes to a "communication problem between Plaintiff and his then attorney (Jones)," he concedes that he is bound by "her statements to the Court and opposing counsel." Pl.'s Resp. p. 1, n. 1 [Doc. 49]. Accordingly, the Court should reject Plaintiff's attempt to now repudiate that prior settlement and should enforce the parties' agreement.

### 2. The Parties' exchange of a written settlement agreement and release was consistent with the fact that they had agreed upon the material settlement terms, not that they were continuing to exchange "offers" and "counter-offers".

Until Plaintiff's Response in Opposition to Defendants' Motion to Enforce, Plaintiff's counsel never contended a settlement was not reached. The issues instead were (1) Plaintiff's decision to abandon his agreement (memorialized by his attorney) to a neutral letter of recommendation; and (2) specific wording of the Settlement Agreement and Release the parties had agreed at the time of settlement to later execute. Plaintiff hardly addresses the first issue in his current brief, likely because the May 2024 emails clearly memorialized this term, and the draft letter given to his lawyer satisfied the agreement. Instead, Plaintiff now claims that *the negotiation of the wording of the Settlement Agreement and Release itself*, a required element of the agreement previously reached, proves a settlement was never reached. The argument is circular, and is supported neither by law favoring enforcement of settlements, nor the actions of

3

the parties after settlement was reached and confirmed on May 23, 2024.

The Mississippi Supreme Court's holding in *Hastings v. Guillot* is instructive. 825 So. 2d 20, 22 (Miss. 2002). There, the court affirmed a motion to enforce settlement where the parties negotiated a settlement agreement at a deposition, but one party later refused to execute the proposed written release and settlement agreement, as Chambers has here. *Id*. at 22. The Mississippi Supreme Court held:

> Perhaps the most compelling evidence that a meeting of the minds had been achieved was the release of the court reporter before the scheduled depositions were concluded. Afterwards, a release and settlement statement were prepared and sent to counsel for Hastings. ***Had there been no meeting of the minds, there would have been no such documentation prepared. Without a meeting of the minds, the attorneys would have proceeded with the case, not prepared settlement documents. Even though there was no discussion about the settlement being contingent on it being reduced to writing, it appears this was simply the next logical step after a settlement agreement had been reached.***

*Id*. at 23 (emphasis added). *Hastings* is on all fours, except that in the present case the parties actually confirmed in writing at the time of settlement "the next logical step" of memorializing their agreement as to the material terms in a mutually acceptable settlement agreement and release.

Moreover, Chambers' reliance on *Logan v. RedMed, LLC* is misplaced. 377 So.3d 956, 956 (Miss. 2024). In that case, the parties' settlement discussions and memorialization of settlement terms specifically left open such terms as the interest rate and length of a promissory note to be issued as part of the settlement, whether the settlement would be confidential, the details of a party's departure from the company, and the form and substance of security to be issued to secure a preexisting note to one of the parties. *Id*. at 960. The parties agreed to resolve such open issues in the following weeks, but they were unable to do so. *Id*. The court then filled in the missing terms on the interest rate and length of promissory note, and gave the parties thirty days to finalize the details regarding Logan's separation. *Id*. On appeal, the court found that the trial court lacked

authority to add material terms that had not been agreed to by the parties, such as the length and interest rate for the note, and that the final exchange between the attorneys and mediator indicated no meeting of the minds sufficient to form a binding agreement had occurred. *Id*. at 962-64. In that exchange, "[t]he mediator twice expressed that, in the end, there was no agreement after an attorney brought up the failure of the parties to a gree to a material term." *Id*. at 965.

Here, the parties specifically agreed to negotiate and execute a mutually acceptable written settlement and release in their May email exchanges, which was expected to embody the material terms outlined in that email exchange. The parties informed the Court that they had reached settlement in principle, and defense counsel drafted and sent a Settlement Agreement and Release (pursuant to the terms reached) to Plaintiff's attorney for review and edits, reserving the right to make additional edits for Defendants. See Exhibit "G" to Defs. Mtn. [Doc. 42].

There was nothing unusual about this process, which occurs regularly after parties reach essential elements of a settlement but are still exchanging written documents as agreed upon, often because a full release is part of the terms of settlement. If during the exchange of drafts either party believed the other has overreached or drafted provisions inconsistent with the agreement reached, either party could revise the draft and and seek resolution of the disputed points or, in many cases, simply the wording of the release or settlement provisions.

In this case, the parties jointly told the Court of their intentions to do this by email of May 24, writing, "[The parties] will be *exchanging a settlement agreement and release and expect that final settlement should be wrapped up by middle to late next week . . . .*" Exhibit "F" to Defs. Mtn. [Doc. 42]. This process was underway until July 12, 2024, when Plaintiff's prior lawyer wrote that "the Plaintiff *was not able to agree to* **the form of the current agreement and that we may have further news to report on Monday, after the parties meet and confer.**" See

Exhibit "I" to Defs. Mtn. [Doc. 42]. Ultimately, the parties agreed to an informal conference with the Court.

Within a week, counsel for Plaintiff sent revisions to the draft which had been provided to her, with requested edits or changes. Exhibit "J" to Defs. Mtn. [Doc. 42]. Defendants promptly either agreed to those changes, or proposed compromises or revisions that could be mutually acceptable – except for one essential and explicit element of the agreement previously reached, which related to the letter to be provided by Defendants upon settlement. The parties had agreed that the form of the letter was to be of a specific type, and Plaintiff's returned revision of that letter was different from that to which the parties had agreed. But for this attempt to alter the original May agreement, the parties had generally agreed even as to the form of the Settlement Agreement and Release, as they had undertaken to do as part of their agreement on the material terms.

The exchange of those drafts is consistent with the fact that the parties had reached agreement on the material terms of settlement, not that they were somehow attempting to "participate[] in new settlement negotiations" because no agreement had ever been reached. Plaintiff's arguments that these exchanges proves that there was no agreement in the first place is unsupported by the record, and his prior counsel's representations to the Court. Indeed, contrary to Plaintiff's arguments, the exchanges of drafts and expected and mostly agreed-upon revisions to reach a mutually acceptable Settlement Agreement and Release were required by the agreement earlier reached. The exchange of such drafts underscores that the Parties had already reached agreement as to the material terms of settlement.

3. ***Plaintiff's claimed "new material terms" do not invalidate the parties' agreement.***

Plaintiff claims that the "draft settlement form" differed from the material terms agreed

upon in May because it included three new material terms. Each of these terms is a common, expected and anticipated element of a final settlement form, and Plaintiff's prior counsel did not object to their inclusion in the bargained-for settlement agreement and release form. In fact, Plaintiff's counsel eventually revised and returned the draft she received, as one would expect in exchanges of a draft release and settlement forms.

Specifically, Plaintiff now argues the following revisions essentially nullified the prior settlement, or established that no settlement was reached: (1) the parties' defining in the Settlement Agreement and Release the amount of consideration to be paid as wages, as opposed to general compensation and attorney fees; (2) the parties' addressing responsibility between each other for satisfying any Medicare interest in the payments; and (3) the request that Plaintiff waive all future actions against Defendants and the released entities (as defined in the agreement) for any private cause of action for damages under a federal Medicare/Medicaid statute. All three arguments are unavailing. Each of these elements was reasonable to address in definitively memorializing the parameters of the parties' agreed-upon Settlement Agreement *and Release*.

The May 20 memorialization of the terms of settlement required "*Payment of [**redacted**], in exchange for dismissal with prejudice of all claims against all parties **and a settlement agreement and global release by Chambers of all claims, known or unknown, against all Defendants, . . . subject to review and approval by the Defendants, in favor of the Defendants.*" Exhibit "D" to Defs. Mtn. [Doc. 42]. Plaintiff's counsel agreed to this term, as well as all others in the May 20, 2024 email.

As to the wage issue, Plaintiff now protests that Defendants, in their first draft of the form settlement agreement and release set out the amount of payment to be allocated for wages, as opposed to compensatory damages, costs and attorneys' fees. He claims that inclusion of this

issue shows that the parties never agreed upon the consideration to be paid. This is false. The

parties agreed upon certain consideration to paid and have never altered the amount. The

allocation-as-wages issue is an expected part of a release, and both the Plaintiff and Defendants

have a duty to truthfully report payments to the IRS for appropriate tax purposes.[2]

Correct allocation of the wages as an element of the release in favor of the Defendants is

important in this case, because Chambers demanded "compensatory damages *for **lost wages,**

**mental anxiety, and emotional distress**.*" Complaint [Doc. 1] at p. 19. His attorney did not

disagree with allocating these amounts as part of the written document, and merely revised the

Defendant's estimate of this amount as a percentage of total damages by about 2.5 percent.

Exhibit "J" to Defs. Mtn. [Doc. 42]. Defendants accepted the slight revision. Exhibit "K" to

Defs. Mtn. [Doc. 42]. Wage allocation was uncontroversial and a reasonable component of the

parties' full agreement, and Plaintiff's attorney in Plaintiff's turn of the draft.

The same is true for for Plaintiff's second and third claimed "new terms," relating to the

satisfaction and indemnification of potential Medicare liens or charges. Plaintiff suggests that the

provision creates unknown and unlimited potential liability for Plaintiff, and argues its inclusion

proves the parties never reached settlement, and were still exchanging offers and counter-offers.

The argument is puzzling. Plaintiff argues that "[i]t is unknown how Medicare/Medicaid

authorities could have any claims related to Chambers or the settlement amount." [Doc.47] at p.

10. Actually, it is either known or completely knowable *to Plaintiff* how such a claim could arise,

potentially defeating the release in favor of the Defendants. Plaintiff could seek medical

---

[2] See, for example, https://www.americanbar.org/groups/business_law/resources/business-law-today/2022-october/employment-settlement-tax-misconceptions/ ("Ideally, each side thinks about taxes in advance and tries to implement what they want in the settlement agreement. That doesn't always happen, however, and even if the parties try, they often fail to hammer out how they want the arrangement to be taxed. The parties may misunderstand the tax issues, or they may fail to consider them entirely until the following year when IRS Forms 1099 arrive. Most employees know that they will receive an IRS Form W-2 for their wages in January for the previous calendar year."

treatment and fail to pay for it, and Medicare or Medicaid could be stuck with the bill, which it could seek to recover from Defendants – keeping them from being released, as Plaintiff promised.

Plaintiff's arguments suggest this will not occur, but that doesn't mean the provision should not be part of a full release in favor of the Defendants. Tellingly, his prior attorney also found the provision uncontroversial, and did not ask to strike, revise, or edit the provision. Its inclusion in the form settlement does not prove settlement was never reached.

It is striking that Plaintiff's July 31 turn of the draft took no issue with any of the three provisions Plaintiff now identifies as material differences so significant that they prove no meeting of the minds occurred. Exhibit "L," at ¶ 5(e) to Defs. Mtn. [Doc. 42]. One may reasonably presume this is because Plaintiff knew when the form settlement and release agreement was exchanged that the wage allocation was a reasonable element of a full release in favor of the Defendants, and that Plaintiff has incurred no undisclosed damages for which CMS might later seek recovery from anyone. Inclusion of these terms was entirely consistent with the full Release promised to Defendants when the parties reached settlement, and should be enforced as agreed in the exchanged drafts.

### 4. *Plaintiff's other miscellaneous contentions do not invalidate the parties' agreement.*

Consistent with his argument that the very act of exchanging form drafts as the parties had agreed somehow resulted in the clawback of the parties' original agreement as to the material terms of settlement, Plaintiff briefly addresses a few miscellaneous elements of the parties' exchanges. Again, all were consistent with the settlement reached, none is extraordinary, and to the extent the parties discussed any of those issues during those exchanges, nearly all were amicably resolved by exactly the process the parties had laid out in their May emailed

9

confirmation of settlement.

For example, Plaintiff claims the parties reached no agreement for time for payment, and that the lack of such a term renders any agreement insufficiently definite. As noted by the Mississippi Supreme Court, however, when a contract does not provide a specific time for performance, the law provides that "performance shall be within a reasonable time." *See*, e.g., *Smith v. Mavar*, 21 So. 2d 810, 811 (Miss. 1945).

Here, the draft agreement provided to Chambers' counsel included a provision for payment within thirty (30) days of full execution of the Agreement by all of the parties, a commercially reasonable and fairly standard time for payment. In Plaintiff's returned draft, Plaintiff's attorney unsurprisingly took no issue with this timing provision.

Plaintiff also cites caselaw applicable to contract formation for the general proposition that "a valid binding contract must demonstrate 'mutual assent' to a 'consideration' term that is 'sufficiently definite.'" [Doc. 47] at p. 5. As explained above, the parties' agreement to specific consideration could not have been more clear in their confirmation of settlement, and thereafter. Plaintiff must ignore his agreement in May to also enter into a mutually acceptable settlement agreement and release, to attack the subsequent provisions addressing allocation of wage, fee, and general compensatory damages, but that does not make the consideration indefinite. The fact that Plaintiff's counsel's returned draft hardly revised these terms highlights the fact that they were natural, expected terms of the written agreement into which the parties agreed to enter.

Plaintiff also makes a cursory argument that Plaintiff's May 23 response to the offer, by itself confirms no agreement was reached. He highlights his attorney's agreement to "revert with comments" as proof that she never accepted the offer the parties had negotiated and reached. This argument hinges on a faulty reading of Ms. Jones' email. One of the terms of the settlement

was that it was to include a written, mutually acceptable Settlement Agreement and Release. Ms. Jones did not write that she would "revert with comments" about the settlement itself; she wrote instead, "Please would you forward me a proposed settlement agreement and release, as well as a proposed letter. We will revert with comment as soon as possible." Exhibit "E" to Defs. Mtn. [Doc. 42]. She clearly was referring to the proposed "form settlement" as Plaintiff refers to it, not the settlement agreement otherwise reached and confirmed in the emails.

Finally, Plaintiff contends his own revisions in his returned draft proves no settlement was ever reached. *See, e.g.,* [Doc. 47] at pp. 14 – 15. In fact, his former attorney's revisions were ordinary turns of a draft, with the shared purpose of creating a mutually acceptable settlement agreement and release, just as the parties had agreed to do in May of 2024. Specifically, Plaintiff argues that his "settlement form" included "a <u>mutual</u> global release of claims, <u>mutual</u> confidentiality, a letter of recommendation (as opposed to neutrality), and a <u>mutual</u> non-disparagement agreement." *Id.* Plaintiff's suggestion that these provisions – except for the letter - - were poison pills that toppled the settlement agreement, is misplaced. Defendants could and did choose to accept three of these four provisions, granting Plaintiff what he asked for, in an effort to finalize the mutually acceptable settlement agreement and release.

On the other hand, Defendants did *not* choose to alter the term to which so much specific attention had been given in the settlement agreement, the letter of recommendation, as Plaintiff demanded. Defendants' acceptance of these other three terms in a final written agreement did nothing to undo the settlement previously reached.

### 5. *Conclusion*

Plaintiff hopes to reverse his attorney's acceptance of Defendants' offer, apparently because Defendants refuse to abandon a written term of the parties' agreement

concerning the contents of the letter to accompany the written settlement agreement and release – a letter which the parties agreed in May would be attached to the still-to-be-drafted Settlement Agreement and Release.[3] He emptily disputes the fact that the parties established the consideration for the settlement in no uncertain terms in their May emails. He ignores the fact that the confirmation of settlement provided for a "global release by Chambers of all claims, known or unknown, against all Defendants, . . . subject to review and approval by the Defendants, in favor of the Defendants**."** However, he cannot avoid the fact that his own attorney, acting in good faith in drafting the required Settlement Agreement and Release, agreed to revisions of a first draft of that document, all in an appropriate effort to put on paper the specifics of a mutually acceptable settlement agreement and release, as the parties had promised they would do.

Plaintiff expresses confusion about the state of the parties' drafting of the "form settlement" documents. There should be none, notwithstanding the Plaintiff's ultimate refusal to complete drafting of the form settlement to which he, through his lawyer, agreed. Defendants' counsel sent a first draft of the form settlement to Plaintiff's counsel (Exhibit "G" to Defs. Mtn. [Doc. 42]) on June 17, 2024. She eventually returned a revised draft to Defendants' counsel (Exhibit "J" to Defs. Mtn. [Doc. 42]). Defendants' counsel made written comments to those revisions (Exhibit K to Defs. Mtn. [Doc. 42]), but mostly accepted them. At Plaintiff's counsel's request, Defendants' counsel incorporated Defendants' revisions into a return redline draft (taken from Plaintiff's last turn of the form settlement), and sent that back to Plaintiff's counsel on July 31, 2024 (Exhibit L to Defs. Mtn. [Doc. 42]). Defendants' counsel continually asked Plaintiff's

---

[3] Plaintiff admits in his briefing that his revision of the form settlement contained a "letter of recommendation (as opposed to neutrality," and makes no argument whatsoever that the Defendant's draft letter did not comply with the form upon which the parties agreed on May 23, 2024.

counsel for the reasons for delay, but received no answer.

If the Court is searching for a final document that memorializes the prior agreement reached in a (nearly) mutually acceptable form, it can be found as the attachment to Exhibit "L" to Defs. Mtn. [Doc. 42]. The transmittal email for Exhibit "L" notes that Defendants rejected Plaintiff's substitution of the words "lost wages" for the words "backpay," because Plaintiff had demanded lost wages in his Complaint, and not backpay. Plaintiff did not disagree with or respond to this issue. Similarly, Defendants reiterated the terms of the original agreement regarding the letter to be attached. As noted above, Plaintiff does not argue that the letter provided as an attachment to the written Settlement Agreement and Release (*see* Exhibit "H" to Defs. Mtn. [Doc. 42].) satisfied the terms of the agreement reached; he simply now insists on a different form of letter.

Very few matters, if any, remain to be resolved in the exchange of the form settlement and release agreement, which embodied the material terms of settlement previously agreed upon by the parties. Plaintiff should be required to execute the last exchanged draft of the Settlement Agreement and Release, or show specific cause why any issues to which he previously agreed should now be revised or deleted from that draft.

THIS, the 25th day of September 2024.

Respectfully submitted,

**AMERICAN FAMILY ASSOCIATION, AFA ACTION, TIMOTHY B. WILDMON, EDWARD VITAGLIANO, WALKER H. WILDMON, LEXIE HILL WILDMON, MARION "BUDDY" C. SMITH , JR., RONALD E. COOK , STACEY SMITH FOWLER, AND ABRAHAM HAMILTON, III**

*Pope S. Mallette*
POPE S. MALLETTE (MB NO. 9836)
J. ANDREW MAULDIN (MB NO. 104227)
*Attorneys for Defendants*

Of Counsel:

MAYO MALLETTE PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Telephone: (662) 236-0055
Facsimile: (662) 236-0035
*pmallette@mayomallette.com*
*dmauldin@mayomallette.com*

14